FILED
2021 MAR 31 PM 2:22
CLERK
U.S. DISTRICT COURT

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF UTAH

| | |
|---|---|
| BRENDA AND CHAD SKINNER,<br><br>　　　　　　Plaintiffs,<br>v.<br><br>ETHICON, INC. et al.,<br><br>　　　　　　Defendants. | MEMORANDUM DECISION<br>AND ORDER<br><br>Case No. 2:20-cv-744 JNP<br><br>District Judge Jill N. Parrish |

Before the court are Defendant Ethicon, Inc. and Johnson & Johnson's (collectively, "Defendants") Motion for Summary Judgment (ECF No. 45), Motion to Exclude Case-Specific Testimony of Stan V. Smith Ph.D. (ECF No. 47), and Motion to Limit or Exclude Case Specific Testimony and Opinions of Bruce Rosenzweig (ECF No. 49). Pursuant to civil rule 7-1(f) of the United States District Court for the District of Utah Rules of Practice, the court elects to determine the motions on the basis of the written memoranda and finds that oral argument would not be helpful or necessary. DUCivR 7-1(f). For the reasons set forth more fully below, Defendants' Motion for Summary Judgment is GRANTED. Defendants' Motion to Exclude Case-Specific Testimony of Stan V. Smith Ph.D. and Defendants' Motion to Limit or Exclude Case Specific Testimony and Opinions of Bruce Rosenzweig are DENIED as MOOT.

## BACKGROUND

**Procedural Background**

This case is one of numerous nationwide cases that arose from alleged injuries that patients suffered following implantation of transvaginal mesh products – products that Ethicon, a wholly owned subsidiary of Johnson & Johnson, manufactured, designed, marketed, and sold – to treat pelvic organ prolapse and other medical conditions. *In re Ethicon, Inc., Pelvic Repair*

*Sys. Prod. Liab. Lit.*, 299 F.R.D. 502, 508 (S.D. W. Va. 2014). In 2012, the United States Judicial Panel on Multidistrict Litigation formed Multidistrict Litigation ("MDL") 2327 for consolidated pretrial proceedings in the United States District Court for the District of West Virginia, before the Honorable Joseph R. Goodwin.

On June 17, 2015, Plaintiffs Brenda Diane Skinner and Chad Skinner ("Plaintiffs") filed their Short Form Complaint in the Southern District of West Virginia as part of MDL 2327. (ECF No. 1.) Plaintiffs seek damages on a theory of product liability arising from alleged defects in Defendants' Prolift pelvic mesh device. (*Id.*) Incorporating the allegations in the Master Complaint, Plaintiffs argue that the Defendants' pelvic mesh product is biologically incompatible with human tissue and promotes a negative immune response in implanted patients.

On November 1, 2019, Defendants moved for summary judgment on all of Plaintiffs' claims. (ECF No. 45.) At or near the same time, Defendants also filed a Motion to Exclude Case-Specific Testimony of Stan V. Smith Ph.D., and a Motion to Limit or Exclude Case Specific Testimony and Opinions of Bruce Rosenzweig, M.D. (ECF Nos. 47 & 49, respectively.)

One year later, on October 27, 2020, after the close of discovery and with Defendants' motions still pending, Judge Goodwin transferred the case to the District of Utah pursuant to 28 U.S.C. § 1404(a). (*See* ECF No. 56.) This court is an appropriate venue because Plaintiffs are domiciled in Utah and the implant procedure occurred in Utah.

On February 22, 2021, this court held a status conference and ordered supplemental briefing on the statute of limitations. (ECF No. 98.)

**Factual Background**

On April 9, 2007, Dr. Kari F. Lawrence implanted Mrs. Skinner with Defendants' Prolift pelvic mesh device for the treatment of pelvic organ prolapse at the American Fork Hospital in

American Fork, Utah. As part of the same procedure, Dr. Lawrence also performed a hysterectomy and implanted a Boston Scientific Obtryx mesh sling to treat Mrs. Skinner's incontinence. (ECF No. 45-2, Pl. Fact Sheet at 4.) Before her surgery, Mrs. Skinner signed an informed consent form that identified Prolift as the device being implanted. (ECF No. 100-6, Skinner Dep. at 62-63; ECF No. 102-3, Informed Consent Form.) The operative medical records for the surgery contain the product identification sticker that was removed from Mrs. Skinner's Prolift kit. The sticker identifies the product as a "Gynecare Prolift" and provides the lot number for the specific Prolift kit implanted in Mrs. Skinner. (ECF No. 102-4, April 9, 2007 Medical Records.)

Prior to the April 2007 surgery, Mrs. Skinner had not experienced pelvic pain or pain with intercourse. (ECF No. 100-6, Skinner Dep. at 59.) "[S]hortly after implant," however, Mrs. Skinner began to experience: "Severe pelvic pain, erosion, infection, urinary problems and bowel problems." (ECF No. 45-2, Pl. Fact Sheet at 6.)

On May 9, 2007, during a follow-up appointment, Dr. Lawrence discovered that Mrs. Skinner had a "small mesh erosion" at the suture line on Mrs. Skinner's vaginal cuff. (ECF No. 102-5, Lawrence Dep. at 64; ECF No. 53-1, May 9, 2007 Medical Records.)

In early July of 2007, approximately three months after surgery, Mrs. Skinner called Dr. Lawrence's office because she experienced a "discharge of blood after intercourse." Mrs. Skinner also expressed her concern that "[s]he doesn't feel that the mesh is healing." (ECF No. 102-6, July 3, 2017 Medical Record; ECF No. 45-4, Lawrence Dep. at 70-72 (reviewing office note documenting Mrs. Skinner's concern that "she has not healed from the gyn surgery and thinks she will probably need to go in for this again," and that Mrs. Skinner "will schedule for a

3

re-approximation of vaginal tissue and revision of mesh"); *see also* ECF No. 45-1, Pls.' Compl. at 2; ECF No. 45-2, Pl. Fact Sheet at 7.)

On August 6, 2007, Dr. Lawrence performed a revision surgery to repair Mrs. Skinner's Prolift mesh erosion. (ECF No. 100-6, Skinner Dep. at 75.) Dr. Lawrence removed the redundant vaginal mesh without complications. (ECF No. 45-4, Lawrence Dep. at 73.)

A few days later, on August 9, 2007, Dr. Wynn H. Hemmert, a Gastroenterologist, performed a colonoscopy on Mrs. Skinner due to Mrs. Skinner's complaints of "fresh blood in her stool." (ECF No. 100-7, Aug. 9, 2007 Medical Records.) Dr. Hemmert noted that Mrs. Skinner was a patient of Dr. Lawrence and that Mrs. Skinner had "developed persistent vaginal mesh erosion at the vaginal cuff which [Dr. Lawrence] repaired two days ago." (*Id.*) Dr. Hemmert documented Mrs. Skinner's reported history of constipation as well as Mrs. Skinner's opinion that since the surgery "she is having bowel movements with much greater ease." (*Id.*) During the colonoscopy, Dr. Hemmert observed a shallow ulceration extending into Mrs. Skinner's rectum, which he believed "should spontaneously resolve." (*Id.*)

On June 2, 2008, Mrs. Skinner called the office of Dr. Kenneth Larsen, an Ob/Gyn. (ECF No. 102-7, June 2, 2008 Medical Records.) Mrs. Skinner described the surgery Dr. Lawrence had performed one year earlier and said that she had experienced "a bunch of medical problems since then." (*Id.*) Mrs. Skinner said that "ever since [the] surgery she has had a low-grade fever of 99 degrees and [ ] she is always nauseated." (*Id.*) Mrs. Skinner reported that she "has never fully healed from her surgery and that they had to go back in and [do something to the] mesh to help her heal in 8/2007." (*Id.*) Mrs. Skinner complained of "vaginal irritation during intercourse" and "is wondering if [her] bladder infections could be from them possibly leaving something inside of her." (*Id.*) Mrs. Skinner also informed Dr. Larsen's office that she had recently been seen by a

4

different health care provider "because she thought she might have gallbladder issues," however, she had "not received the results yet." (*Id.*)

On June 12, 2008, Mrs. Skinner met with Dr. Larsen. Dr. Larsen documented the appointment as follows:

> This patient . . . presents with problematic vaginal discharge and pain with intercourse. She underwent a total vaginal hysterectomy with left anterior and posterior repair at American Fork Hospital last year using Prolift. This was complicated by mesh erosion and repair mesh erosion about 3 months after that. She continues to have problems with discharge and did not follow up with her physician there because she went on a long-term maternity leave.

(ECF No. 53-4, June 12, 2008 Medical Records.) Dr. Larsen also noted that Mrs. Skinner had experienced "recurrent urinary tract infections since the placement of the mesh which is being followed by Dr. Clark at this time." (*Id.*) During the June 12, 2008 appointment Dr. Larsen discovered a second mesh erosion that was "dime sized," "located at the level of the vaginal cuff," and "likely the source of the discharge and tenderness in that area." (*Id.*) Dr. Larsen's diagnosis was: "Mesh erosion after Prolift surgery." Dr. Larsen recommended "pelvic rest," and suggested doing a "vaginal repair of this mesh erosion" at the same time as Mrs. Skinner's anticipated cholecystectomy (gall bladder removal). (*Id.*)

On August 15, 2008, Mrs. Skinner reported to Alta View Medical Center for two distinct procedures. (ECF No. 102-9, Aug. 15, 2008 Medical Records) First, Dr. Darrin Hansen performed a cholecystectomy, appendectomy, and umbilical hernia repair. (ECF No. 105-2, Aug. 15, 2008 Medical Records). When Dr. Hansen finished, Mrs. Skinner remained in the operating room and Dr. Larsen performed a revision surgery to repair the mesh erosion he had observed on June 12, 2008. (ECF No. 102-9, Aug. 15, 2008 Medical Records) Dr. Larsen's pre- and post-operative diagnoses were the same: "exposed vaginal mesh from Prolift procedure." The Operative Report described the procedure as an "[e]xcision of exposed mesh with repair." (*Id.*)

5

On August 26, 2009, approximately one year following the second revision surgery, Mrs. Skinner met with Dr. Larsen, again complaining of upper vaginal pain, pain with intercourse, and left lower quadrant pain associated with constipation. (ECF No. 53-6, Aug. 26, 2009 Medical Records.) Dr. Larsen observed that Mrs. Skinner had a "[s]mall neuroma at the top of her vaginal cuff." (*Id.*) However, Mrs. Skinner declined intervention and said that she "simply wanted to be sure that there was no more erosion of the mesh." (*Id.* ("Patient does not desire trigger point injections or other treatment for the small neuroma at the vaginal cuff.").)

On June 22, 2011, Mrs. Skinner returned to see Dr. Lawrence complaining of a significant amount of alternating constipation and diarrhea. Dr. Lawrence noted that Mrs. Skinner is "currently being followed by a gastroenterologist" and recommends "continued follow up with GI." (ECF No. 100-4, Lawrence Dep. at 75.)

On May 3, 2013, Mrs. Skinner reported to the Central Utah Clinic where she was examined by Nurse Practitioner Carol Graff. (ECF No. 104-4 (SEALED), May 3, 2013 Medical Records.) Mrs. Skinner's chief complaints were "pelvic pain, constipation, dysuria, urinary hesitancy." (*Id.*) NP Graff documented Mrs. Skinner's "history of present illness" and stated that "[Mrs. Skinner] has had multiple health issues since 2007 and problems that she feels have stemmed from her initial hysterectomy and the mesh that eroded." (*Id.*) Given Mrs. Skinner's "chronic pelvic pain and mesh problems," Nurse Graff opines that Mrs. Skinner "needs to have an evaluation from our MD." Accordingly, NP Graff suggests that Mrs. Skinner schedule a consult with Dr. Allen regarding her pelvic issues. (*Id.* at 5.)

In early 2014, Mrs. Skinner reported experiencing severe pain in her lower abdomen, pelvic pain, dyspareunia, and a burning sensation when she urinated. (ECF No. 100-6, Skinner Dep. at 32-34.) Mrs. Skinner acknowledged that these symptoms "started out painful before

6

2014," but explained that in 2014 "it was extreme … it was so bad that I seeked [sic] help." (*Id.* at 33.)

On April 15, 2014, Mrs. Skinner presented to Dr. Nicholas Paulk, her gastroenterologist, with complaints of chronic constipation. (ECF No. 104-5 (SEALED), April 15, 2014 Medical Record.) Dr. Paulk noted:

> [Mrs. Skinner] is convinced that her constipation issues are related to the mesh that was placed [when] she had a rectocele repaired. I discussed these possibilities with her and she expressed a desire to see a uro-gynecologist in order to discuss this mesh and possible removal of it. I was quite frank with her and saying that even if the mesh were removed, there is no guarantee her constipation would improve.

(*Id.*) Dr. Paulk referred Mrs. Skinner to Dr. Yvonne Hsu for treatment of Mrs. Skinner's mesh complications. (ECF No. 100-6, Skinner Dep at 78-79.)

In June of 2014, Mrs. Skinner met with Dr. Hsu and Dr. Hsu recommended surgery to remove the mesh. (*Id.*) Mrs. Skinner testified at her deposition that it was at this time – during her visit with Dr. Hsu in June 2014 – that she first came to believe that the Prolift mesh was causing any of her injuries. (*Id.*)

On June 23, 2014, Dr. Hsu surgically removed Mrs. Skinner's Prolift implant. (ECF No. 102-15, June 23, 2014 Medical Records.)

One year later, on June 17, 2015, Plaintiffs filed their Short Form Complaint in MDL 2327. (ECF No. 1.) Mrs. Skinner testified at her deposition that she decided to file this lawsuit because of the unbearable pain she was experiencing in 2014. (ECF No. 100-6, Skinner Dep. at 32.)

On November 1, 2019, Defendants moved for summary judgment on all of Plaintiffs' claims, alleging that Plaintiffs filed their Short Form Complaint outside the relevant statute of limitations. Alternatively, Defendants moved for summary judgment on the merits of each of

Plaintiffs' individual causes of action. (ECF No. 45.) Plaintiffs argue their claims are not time-barred because they did not and could not have discovered the facts necessary for their claims to accrue until 2014, which is within two years of when they filed suit. Plaintiffs also argue that summary judgment in favor of Defendants is inappropriate on the individual other claims. (ECF No. 50.) On February 23, 2021, after the case was transferred to the District of Utah, this court ordered supplemental briefing on whether Plaintiffs' claims are time-barred by the Utah Product Liability Act's two-year statute of limitations. (ECF No. 98.)

## LEGAL STANDARD

Summary judgment is appropriate when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The movant bears the initial burden of demonstrating the absence of a genuine dispute of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Once the movant has met this burden, the burden then shifts to the nonmoving party to "set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The court must "examine the factual record and reasonable inferences therefrom in the light most favorable to … the party opposing summary judgment." *Concrete Works of Colorado, Inc. v. City & Cty. of Denver*, 36 F.3d 1513, 1517 (10th Cir. 1994). "[T]he judge's function is not to weigh the evidence and determine the truth of the matter." *Id.* at 1518 (citing *Anderson*, 477 U.S. at 249). "Nonetheless, '[w]here the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party,' summary judgment in favor of the moving party is proper." *Id.* (alteration in original) (quoting *Matsushita Elec. Indus. Co v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)).

## DISCUSSION

Mrs. Skinner had Defendants' Prolift mesh product implanted on April 9, 2007 and Plaintiffs filed their Short Form Complaint on June 17, 2015. The issue before the court is when the Plaintiffs' claims accrued for purposes of the statute of limitations.

The Utah Product Liability Act (UPLA) states: "A civil action under this part shall be brought within two years from the time the individual who would be the claimant in the action discovered, or in the exercise of due diligence should have discovered, both the harm and its cause." Utah Code § 78B-6-706.[1] The UPLA applies to all claims – including Plaintiffs' claims in this case – that are brought "against a manufacturer based on a defective product in both tort and contract, including claims based on negligence, strict liability, tortious misrepresentation, and breach of warranty." *Mecham v. C.R. Bard, Inc.*, 2:19-cv-750, 2020 WL 2768997, at *3 (D. Utah May 27, 2020) (citing *Utah Local Government Trust v. Wheeler Machinery Co.*, 199 P.3d 949, 951 (Utah 2008)); *see In re Boston Sci. Corp.,* 2:12-cv-3700, 2015 WL 1466746, at *4 & n.2 (S.D. W. Va. Mar. 30, 2015), *aff'd sub nom. Robinson v. Boston Sci. Corp.*, 647 Fed. Appx. 184 (4th Cir. 2016); *see also Cannon v. Minnesota Min. & Mfg Co.*, 2:08-cv-532, 2009 WL 350561, at *4 (D. Utah Feb. 11, 2009) (holding that loss of consortium claim is subject to the same limitations and defenses as the underlying claims of injured person).

Section 78B-6-706 of the UPLA explicitly incorporates a discovery rule, which delays the accrual of a claim until the plaintiff "discovers (or should have discovered) all of the facts that form the basis for the cause of action." *Aragon v. Clover Club Foods Co.*, 857 P.2d 250, 252 (Utah Ct. App. 1993). Because the Supreme Court of Utah has yet to elaborate on the precise contours of Utah's discovery rule, this court and others have followed the Utah Court of Appeals decision in *Aragon v. Clover Club Food Company,* 857 P.2d 250 (Utah Ct. App. 1993). *See*

---

[1] The parties agree that Utah law governs Plaintiffs' substantive claims. (ECF No. 46 at 3-5; ECF No. 50 at 2 n.4.)

*Mecham*, 2020 WL 2768997, at *3; *see also Proctor & Gamble Co. v. Haugen*, 222 F.3d 1262, 1280 (10th Cir. 2000) (providing that "in the absence of Utah Supreme Court precedent," federal courts must apply the legal framework set "by the lower Utah courts").

Under *Aragon*, the UPLA statute of limitations begins to run when the plaintiff discovers or should have discovered: (1) that she has been injured; (2) the identity of the maker of the allegedly defective product; and (3) that the product has a possible causal relation to her injury. *Aragon*, 875 P.2d at 252-53; *see also Mecham*, 2020 WL 2768997, at *3; *Hansen v. Novartis Pharm. Corp.*, No. 2:08-CV-985, 2011 WL 6100848, at *3 (D. Utah Dec.7, 2011) (unpublished) (applying the three-part *Aragon* test).

The knowledge required of a plaintiff in this context is inquiry notice. *Hansen*, 2011 WL 6100848, at *3. "[A] plaintiff need not have a 'confirmed diagnosis' about the causal relation to trigger the running of the statute of limitations." *Id.* Rather, all that is required "is sufficient information to put plaintiff [ ] on notice to make further inquiry if [she] harbors doubts or questions." *Id.* Generally, "when a plaintiff knew or with reasonable diligence should have known of a cause of action is a question of fact for the jury." *Mecham*, 2020 WL 2768997, at *4. However, "[w]here the evidence is so clear that there is no genuine factual issue … the determination can be made as a matter of law." *Id.* (citing *McKinnon v. Tambrands, Inc.*, 815 F. Supp. 415, 418 (D. Utah 1993)).

In this case, even assuming the facts and inferences in favor of Plaintiffs, the evidence conclusively demonstrates that there is no genuine factual issue that Plaintiffs discovered, or should have discovered, Mrs. Skinner's injury, the identity of Defendants, and a possible causal relation between the injury and Defendant's pelvic mesh product more than two years before

filing their complaint. Thus, as a matter of law, Plaintiffs' claims are time-barred under the UPLA.

> **1. Plaintiffs discovered, or should have discovered, their injuries more than two years before filing their complaint.**

The first inquiry is when Plaintiffs discovered, or with reasonable diligence should have discovered, that Plaintiffs suffered an injury as contemplated by the UPLA. The relevant harm must be a "physical injury or illness suffered by the plaintiff as a result of the defendant's conduct." *Adams v. American Med. Sys., Inc.*, 705 Fed. Appx. 744, 746 (10th Cir. 2017). Plaintiffs need not understand the full extent of their injury for the limitations period to begin running, and the fact that they later experienced different or more severe injuries does not re-start the limitations period. *McHenry v. Utah Valley Hosp.*, 724 F. Supp. 835, 839 (D. Utah 1989), *aff'd*, 927 F.2d 1125 (10th Cir. 1991). "Instead, Defendant must merely show that Plaintiffs knew or should have known that [they] had suffered 'actual damages' over two years before filing their Complaint." *Mecham*, 2020 WL 2768997, at *4.

Relying on Mrs. Skinner's deposition testimony, Plaintiffs' assert that Mrs. Skinner's injuries "began to appear in 2014 and that these were new injuries and something that she had not previously experienced." (ECF No. 100, Pls.' Supp. Mem. at 7; ECF No. 105, Pls.' Opp'n at 3.) Plaintiffs argue that "this testimony, viewed in the light most favorable to the Plaintiffs, creates a jury issue on whether her injuries began in 2014, a date less than two years from when the complaint was filed. (*Id*.)

Plaintiffs' position is not supported by the record and is contradicted by Mrs. Skinner's own testimony. Although facts must be viewed in the light most favorable to the nonmoving party at the summary judgment stage, "[w]hen opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court

should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." *Scott v. Harris*, 550 U.S. 372, 380 (2007). Such is the case here.

In the sworn Plaintiff Fact Sheet filed in the MDL, Plaintiffs attested that Mrs. Skinner first experienced symptoms of any of the bodily injuries that she now attributes to her Prolift implant "[s]hortly after implant." (ECF No. 45-2 at 6.) Mrs. Skinner's medical records – documents created simultaneously with the events as they transpired – support this sworn statement and demonstrate that Plaintiffs were aware they had suffered actual injury as early as 2007.

For example, Mrs. Skinner, who testified that she had not experienced dyspareunia (pain with intercourse) prior to the April 2007 surgery, reported complaints of dyspareunia to Dr. Lawrence in July 2007 and to Dr. Larsen on June 12, 2008 and August 9, 2009. In 2008, Mrs. Skinner also told Dr. Larsen she had been experiencing problematic discharge, frequent infections, and "a bunch of medical problems" since the Prolift implantation surgery. (ECF No. 102-7.) In May of 2013, when Mrs. Skinner reported to the Central Utah Clinic, her chief complaints included pelvic pain, dysuria, and urinary hesitancy. (ECF No. 104-4 (SEALED).)

Moreover, Mrs. Skinner's deposition testimony expressly acknowledges that prior to 2014 she experienced painful symptoms attributed to the Prolift. (ECF No. 100-6, Skinner Dep. at 33 ("It started out painful before 2014, but like it was extreme").) Her deposition testimony simply clarifies that in 2014 these previously existing symptoms "got way worse." (*Id.*) That Mrs. Skinner may have experienced different or more severe injuries beginning in 2014 does not alter the analysis. "An initial injury beyond a nominal harm 'begins the [UPLA] limitations period, and later injuries, even new and severe ones, do not re-start it.'" *Mecham*, 2020 WL 2768997, at *4 (quoting *Cannon v. Minn. Mining & Mfg. Co.*, No. 2:08-cv-532, 2009 WL

12

350561, at *6 n.2 (D. Utah Feb. 11, 2009); *see Kelly v. Ethicon, Inc.*, No. 20-cv-2036, 2021 WL 54566, at *6 n.7 (N.D. Iowa Jan. 6, 2021) ("[T]he discovery of new medical issues or attribution of such issues to the original injury does not refresh or restart an expired limitations period.").

Finally, courts have repeatedly found that plaintiffs knew or should have known of their injuries, at the latest, when they experienced a mesh erosion and were required to undergo a revision surgery. *See Adams v. American Med. Sys., Inc.*, 705 Fed. Appx. 744, 747 (10th Cir. 2017) (finding that plaintiffs were on notice of their injuries, at the latest, when they experienced a mesh erosion and were required to undergo a revision surgery); *Timothy v. Boston Scientific, Inc.*, 665 Fed. Appx. 295, 297 (4th Cir. 2016) (same). In this case, Mrs. Skinner suffered no fewer than two mesh erosions – injuries of which she was aware and that she attributes the Prolift – each of which required a revision surgery, with the first revision surgery occurring on August 6, 2007 and the second revision surgery occurring on August 15, 2008.

Based on this evidence, no reasonable jury could find that Plaintiffs did not discover their injuries until 2014. By Plaintiffs' own admission, they had actual knowledge of injuries as early as within a few months of Mrs. Skinner's 2007 implantation surgery, and at the latest by the date of Mrs. Skinner's second revision surgery on August 15, 2008.

2. **Plaintiffs discovered, or should have discovered, Defendants' identity more than two years before filing their complaint.**

Second, the court must determine when Plaintiffs discovered, or in the exercise of reasonable diligence should have discovered, the identity of Ethicon, the manufacturer of Prolift. "It is well established that plaintiffs cannot simply wait for information regarding a potential defendant to come to them . . . . Rather, a plaintiff has a duty to act with reasonable diligence to ascertain the identity of a defendant." *Pratt v. Cavagna N. Am., Inc.*, No. 2:13-cv-107, 2013 WL 6146075, at *4 (D. Utah Nov. 21, 2013).

13

In medical products liability actions, courts have routinely found that an informed consent form correctly identifying the name of the implanted device can put a plaintiff on notice of the manufacturer's identity. *See Mecham*, 2020 WL 2768997, at *6; *Griffiths-Rast v. Sulzer Spine Tech.,* 216 Fed. Appx. 790, 796 n.4 (10th Cir. 2007). Applying that rationale here, Plaintiffs could have discovered Prolift's "identity" (that Prolift was the name of the implanted product) as early as April 9, 2007, the date of Mrs. Skinner's implant surgery, because Prolift is listed on the informed consent form Mrs. Skinner signed prior to surgery. (ECF No. 102-3, Informed Consent Form.) Additionally, Prolift is identified in several of Mrs. Skinner's medical records, including but not limited to the following: (1) The operative medical records, containing a product sticker identifying Prolift by name and providing the lot number for the specific Prolift kit implanted in Mrs. Skinner (ECF No. 102-4); (2) The medical records documenting Mrs. Skinner's May 9, 2007 post-operative follow-up visit with Dr. Lawrence (ECF No. 102-16 ("Patient presents for follow up from Transvaginal Hysterectomy Anterior and Posterior Colporaphy [sic] with Prolift Mesh System")); and (3) The medical records documenting Mrs. Skinner's June 2008 appointment with Dr. Larsen (ECF No. 53-4 ("Assessment: Mesh erosion after Prolift surgery")).

With this information identifying Prolift as the implanted device, Plaintiffs could have conducted a simple internet search to determine that Ethicon is the manufacturer of Prolift.[2] Plaintiffs have not presented any evidence to suggest they could not have discovered Defendants' identity on or around the time of Mrs. Skinner's implant procedure. Moreover,

---

[2] A google search for the term "Prolift" limited to the two years following Mrs. Skinner's implant surgery returns numerous results identifying Ethicon and Johnson & Johnson, including a link to the FDA's website containing correspondence between Ethicon and the FDA concerning Ethicon's application for clearance of Prolift. *See* tinyurl.com/4fnv94f5 (last visited March 24, 2021); https://www.accessdata.fda.gov/cdrh_docs/pdf7/K071512.pdf (last visited March 24, 2021). *See Mecham*, 2020 WL 2768997, at *6 n.6 (conducting a similar Google search).

14

Plaintiffs do not appear to dispute that they readily could have done so. (*See* ECF No. 100 at 6 (addressing only parts (1) and (3) of the three-part framework for determining when claim accrues).)

### 3. Plaintiffs discovered, or should have discovered, a possible causal relation between their injuries and Defendants' product more than two years before filing their complaint.

The final point of inquiry is when Plaintiffs knew or exercising due diligence should have known that Defendants' pelvic mesh product had a possible causal relation to Mrs. Skinner's injuries. *Mecham*, 2020 WL 2768997, at *6 (citing *Adams*, 705 Fed. Appx. at 747); *see also Pratt*, 2013 WL 6146075, at *3 (stating that §78B-6-706's limitations period begins to run when, among other things, "the plaintiff discovers, or should have discovered … that the product had a possible causal relation to her injury").

According to Plaintiffs, Mrs. Skinner did not suspect a possible causal relation between her injuries and the Defendants' Prolift device until 2014, "around the time when Dr. Hsu surgically removed her mesh." (ECF No. 100 at 8; ECF No. 100-6, Skinner Dep. at 115 ("Q. When did you first come to believe that your mesh may be causing any of your injuries? A. 2014").) Plaintiffs argue they could not reasonably have discovered the cause of their injuries prior to 2014 because: (1) prior to 2014 "none of [Mrs. Skinner's] doctors had told her that the mesh was causing any problems (ECF No. 105 at 4); and (2) Mrs. Skinner suffered from "complex [gastrointestinal] issues," and prior to 2014 Mrs. Skinner's doctors identified her symptoms as being "gastrointestinal nature" and she relied on that information. (ECF No. 100, Pls.' Supp. Mem. at 8-11.) Once again, the court finds that Plaintiffs' arguments are contradicted by the evidence.

First, it is well-established that a plaintiff need not have a 'confirmed diagnosis about the causal relation to trigger the running of the statute of limitations.'" *Mecham*, 2020 WL 2768997, at *6 (quoting *Hansen*, 2011 WL 6100848, at *3). "Because the 'knowledge required of a plaintiff is inquiry notice,'" all that is required is "sufficient information to put [Plaintiffs] on notice to make further inquiry if they harbor doubts or questions" about the cause of Mrs. Skinner's injuries. *Id.* Additionally, the UPLA's discovery rule does not require knowledge of a causal connection between the injury and a *defect* in the product, it simply requires a causal connection between the injury and the product in general. *See id.*; *Adams,* 705 Fed. Appx. at 742 (finding no support for plaintiff's claim that under Utah law the statute of limitations did not begin to run until she knew or should have known that her harm was caused by a *defect* in the mesh sling). *See generally In re Boston Scientific Corp.*, No. 2:12-cv-3700, 2015 WL 1466746 at *4 (S.D. W. Va. March 30, 2015), *aff'd*, 647 Fed. Appx. 184 (4th Cir. 2016) (unpublished) (per curiam).

In any event, it is undisputed that Dr. Lawrence attributed Mrs. Skinner's erosions and the resulting August 2007 revision surgery to the Prolift mesh. (ECF No. 102-5, Lawrence Dep. at 65:12-17, 67, 71.) In August 2008, Dr. Larsen also attributed Mrs. Skinner's erosions to the Prolift mesh and Dr. Larsen specifically identified the eroded Prolift mesh as the likely cause of Mrs. Skinner's discharge and vaginal tenderness. (ECF No. 53-4). The revision surgery performed by Dr. Larsen on August 15, 2008 was described as an "excision of exposed mesh with repair" due to "exposed vaginal mesh from Prolift procedure." (ECF No. 102-9.) Based on these facts, Plaintiffs had inquiry notice no later than August of 2008 when Dr. Larsen determined that the mesh was likely causing Mrs. Skinner's pelvic tenderness and it needed to be surgically repaired. *See In re Boston Scientific Corp.*, No. 2:12-cv-5950, 2015 WL 1405498, at

*7 (S.D. W. Va. March 26, 2015) (applying Utah law and finding that Plaintiff had inquiry notice when informed by her doctor that the mesh was causing her problem and needed to be surgically repaired), *aff'd sub nom. Timothy v. Boston Scientific Corp.*, 665 Fed. Appx. 295 (4th Cir. 2016).

Additionally, no reasonable interpretation of the evidence could lead to the conclusion that all of Mrs. Skinner's pre-2014 injuries – injuries that included mesh erosion, pelvic pain, dyspareunia, and urinary tract infections – were caused by gastrointestinal problems. The medical records confirm that Mrs. Skinner's healthcare providers were cognizant that Mrs. Skinner suffered from a variety of different medical conditions, and that a given set of symptoms may have multiple possible causes. For example, Drs. Hansen and Larsen coordinated their surgical schedules so that Mrs. Skinner's second revision surgery could be performed at the same time as her cholecystectomy. (ECF No. 105-2.) Similarly, Dr. Hemmert, the gastroenterologist, noted that he was treating Mrs. Skinner because she reported "blood in her stool." Dr. Hemmert additionally noted that Mrs. Skinner was a patient of Dr. Lawrence who "had developed persistent vaginal mesh erosion at the vaginal cuff which was repaired two days ago." (ECF No. 100-7.) Likewise, when Dr. Lawrence examined Mrs. Skinner in 2011 for complaints related to "alternating constipation and diarrhea," Dr. Lawrence recommended "continued follow-up with GI." (ECF No. 100-4.)

Moreover, Mrs. Skinner's own statements to medical providers reveal that she believed her medical problems had a possible causal connection to, or in her words "stemmed from," the Prolift mesh. As early as June of 2007 Mrs. Skinner told Dr. Lawrence that she "doesn't feel like the mesh is healing." (ECF No. 102-6.) A year later, in June of 2008 Mrs. Skinner reported to Dr. Larsen that she had "experienced a bunch of medical problems since [the 2007 hysterectomy and

Prolift implant surgery]" and said that she "never fully healed from [the] surgery." (ECF No. 102-7.) Additionally, on May 3, 2013 Mrs. Skinner told Nurse Practitioner Graff that she "has had multiple health issues since 2007 and problems that she feels have stemmed from … the mesh that eroded." (ECF No. 104-4 (SEALED).)

Finally, even if Plaintiffs were not personally aware of the cause of their injuries, courts have found that "because the FDA had issued an official notification about the link between the pelvic mesh [Plaintiff] had implanted and the injuries she suffered, a reasonably diligent plaintiff inquiring about her symptoms would have been on notice that the pelvic mesh had a 'possible causal relation' to her injuries." *Mecham*, 2020 WL 2768997, at *8; *see Kelly v. Ethicon, Inc.*, No. 20-cv-2036, 2021 WL 54566, at *9 (N.D. Iowa Jan. 6, 2021) (finding a reasonable inquiry into the cause of plaintiff's injuries "would have been fruitful" because it would have revealed the FDA Public Health Notifications); *Hutchinson v. Boston Sci. Corp.*, No. 20-cv-1084, 2020 WL 5752393, at *4 n.3 (D. Del. Sept. 25, 2020) (taking judicial notice that by 2008 "there was a known connection between pelvic mesh implants and the types of injuries Plaintiff claims to have suffered). The same reasoning applies with equal force here as Plaintiffs had more than sufficient information to "excite attention and put the party on his guard and call for inquiry." *Mecham*, 2020 WL 2768997, at *3.[3] Had Plaintiffs investigated whether the mesh was causing her injuries, a reasonable jury could only find that the investigation would have been fruitful. On October 20, 2008, the Food and Drug Administration issued a public health notification entitled "Serious Complications Associated with Transvaginal Placement of Surgical Mesh in Pelvic

---

[3] It is insignificant that the October 20, 2008 FDA Public Health Notification and the FDA's July 13, 2011 updated Public Health Notice were published shortly after to Mrs. Skinner's April 2007 Prolift implantation and the 2007 and 2008 revision surgeries. As other courts have recognized, the relevance of the information is based on their availability at a time when the plaintiffs were on notice of their injuries and had a duty to investigate the cause of their injuries. *See Tily v. Ethicon, Inc.*, No. 20-2582, 2020 WL 5369724, at *5-*6 (E.D. Penn. Sept. 8, 2020); *Kelly v. Ethicon, Inc.*, No. 20-cv-2036, 2021 WL 54566, at *9 (N.D. Iowa Jan. 6, 2021).

Organ Prolapse and Stress Urinary Incontinence.[4] The report concerned the types of products and injuries of which Plaintiffs now complain. *Kelly,* 2021 WL 54566, at *9. "'[E]ven the most basic inquiry' would have led Plaintiffs to the FDA's notification about transvaginal mesh products." *Id.* (quoting *Tily v. Ethicon, Inc.*, No. 20-2582, 2020 WL 5369724, at *5 (E.D. Pa. Sept. 8, 2020)).

As previously stated, Utah law does not require absolute knowledge to trigger the statute of limitations. "[A]ll that is required … is sufficient information to put [Plaintiffs] on notice to make further inquiry if they harbor doubts or questions." *Macris v. Sculptured*, 24 P.3d 984, 990 (Utah 2001). And, once a party is on notice to make further inquiry, they are "charged with knowledge of any facts that a reasonable investigation would have uncovered." *Salt Lake City Corp. v. Sekisui*, 412 F. Supp. 3d 1316, (D. Utah Sept. 26, 2019). Applying this standard, the court finds that no reasonable jury could conclude that Plaintiffs did not discover or could not have reasonably discovered a possible causal relation between their injures and Defendant's product less than two years before they filed suit.

## IV. CONCLUSION

For the reasons stated, even assuming the facts and inferences in favor of Plaintiffs, the evidence conclusively demonstrates that there is no genuine factual dispute that Plaintiffs discovered, or in the exercise of reasonable diligence should have discovered, Mrs. Skinner's injury, the identity of Defendants, and a possible causal relation between the injury and Defendants' product more than two years before filing their complaint. Therefore, Defendants'

---

[4] Available at: http://wayback.archive-it.org/7993/20170111190506/http://www.fda.gov/MedicalDevices/Safety/AlertsandNotices/PublicHealthNotifications/ucm061976.htm.

Motion for Summary Judgment (ECF No. 45) is GRANTED, and the case is DISMISSED with prejudice.

Having granted Defendants' motion for summary judgment, Defendants' Motion to Exclude Case-Specific Testimony of Stan V. Smith Ph.D. (ECF No. 47) and Defendants' Motion to Limit or Exclude Case Specific Testimony and Opinions of Bruce Rosenzweig, M.D. (ECF No. 49) are DENIED as MOOT.

Signed March 30, 2021.

BY THE COURT:

Jill N. Parrish
United States District Judge